THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 27, 2018 Session

## DAVID WILLIAM LOWERY v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Anderson County**
**No. A8CR0117      Donald Ray Elledge, Judge**

**_____**

### No. E2017-02537-CCA-R3-PC
**_____**

Petitioner, David William Lowery, appeals the denial of his petition for post-conviction relief from his convictions for three counts of aggravated child abuse. On appeal he contends that he received ineffective assistance of counsel. Petitioner also appeals the denial of his petition for writ of error coram nobis based upon newly discovered evidence. After thoroughly reviewing the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., and D. MICHAEL SWINEY, Sp.J., joined.

John H. Baker, III, Murfreesboro, Tennessee (on appeal) and William Bullock, Franklin, Tennessee (at trial) for the appellant, David William Lowery.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; David S. Clark, District Attorney General; and Tony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

*Trial*

The facts of this case as set forth by this court on direct appeal are as follows:

Dr. Charles Machen, an expert in the field of pediatric medicine, testified that he was the pediatrician for the victim, D.L., and first examined the victim when he was six days old. He also examined the victim in his office on November 28, 2007, to check the baby's jaundice and weight, and on December 14, 2007, at the baby's one-month checkup. On January 24, 2008, at the victim's two-month checkup, the victim's mother mentioned that the victim had not been moving his left arm as well as his right arm for the last two weeks. After examining the child, Dr. Machen noticed that the victim's eyes "failed to fix" or focus on his face the way a normal baby's eyes would. He also confirmed that the victim was not moving his left arm properly, and when he manipulated the victim's left arm, the victim cried for a short time. When Dr. Machen turned the victim on his stomach, he noticed a "fairly large bruise" in a "pattern similar to an open hand" on the victim's back below his left shoulder blade. The bruise appeared "fresh" because there was no "yellowing" of it. The victim's mother appeared "shocked" to see the victim's bruise and began to cry. She told Dr. Machen that she and her husband loved the baby and that "no one would hurt this baby and no one was losing their temper with the baby[.]" Because of the victim's bruise and the lack of movement in the victim's left arm, Dr. Machen informed the victim's mother that an x-ray needed to be taken of the victim's arm at the hospital and that he would have to report his findings to the Department of Children's Services (DCS). The victim's mother appeared cooperative.

The victim's mother and Lowery's ex-wife, testified that she stayed home with the victim and their older son while Lowery, the children's father, worked as an occupational therapist assistant. Although she took primary responsibility for feeding the victim, Lowery gave the victim his last feeding of the night. She did not know when Lowery went to bed because he stayed up later than she did and slept in a room with their older son. She described the victim as a "very calm baby." Although the victim "acted normal" when she was holding him, he "screamed a lot" when Lowery held him, and Lowery was unable to console him. At the time, she did not believe that anything was wrong with the victim.

When the victim was approximately two months old, his mother walked into a room and saw that Lowery had the victim "underneath his arms" and was "kind of rocking him back and forth." Lowery immediately stopped rocking the child when she entered the room, and the victim's mother told him that holding the victim in that manner was not good for the victim's neck. She said Lowery made her "feel like [she] was being

over-protective" and "was overreacting" to how he was holding the victim.

The victim's mother said that when Dr. Machen examined the victim before the two-month checkup, everything was normal. She said that two days before the victim's two-month checkup, she noticed that something was wrong with the victim's arm. However, because the victim was eating fine, sleeping fine, and moving the rest of his limbs fine, she waited until the scheduled doctor's appointment to discuss it with Dr. Machen. The morning of the victim's appointment, she spoke with her husband's sister, Susan Tipton, and told her she was thinking about taking the children to see her family in Illinois for a few weeks. She said Tipton was not happy about her taking the children and "threatened [her] with a baseball bat." When she left to take the victim to the doctor, Lowery was lying on the couch because he "had been throwing up all night."

At the victim's two-month checkup, the victim's mother told Dr. Machen that he was not moving his left arm properly, and after examining him, Dr. Machen agreed that something was "not right" with the victim's arm. When Dr. Machen turned the victim on his stomach, they both saw the bruise on the victim's back. The victim's mother said she had not seen the bruise before that moment and was "in shock[.]" She said the bruise looked like a hand print because she could see the finger marks from what looked like a fist. Dr. Machen asked the victim's mother if her older son could have caused the bruise, and she replied that it was impossible because she never left the victim alone with her older son. Dr. Machen instructed the victim's mother to take the victim to the hospital and told her that he was going to have to call DCS.

The victim's mother immediately returned home and picked up Lowery and her older son to go with them to the hospital. She also called their pastors from church, who were close friends, and the pastors agreed to meet them at the hospital. She said that on the way to the hospital, Lowery admitted that the victim's injuries "had to have been something [he] had done."

Upon arriving at the hospital, several x-rays were performed on the victim. The victim's mother said that "[t]hey just kept on finding more and more things and kept on coming and telling me more things were wrong with [the victim]." She was extremely worried about the victim and was alarmed because she did not know how the victim's injuries had

- 3 -

occurred. A cast was placed on the victim's arm, which was broken, and the victim was admitted to the hospital. Physicians later told the victim's mother that in addition to having a broken arm, the victim also had sustained fractures to both legs and to several ribs. The victim's mother asserted that she had done nothing to cause the victim's injuries because she had never dropped, hit, or yanked the victim.

At the hospital, the victim's mother was interviewed by Detective Boucher, and she gave a written statement to him in the presence of DCS workers. Then Lowery was interviewed by Detective Boucher, although she was not present for his interview. That day, the DCS workers prevented the victim's mother from having contact with the victim or her older child, which made her feel "[h]elpless" and "awful."

That night, Lowery drove the victim's mother home. When they arrived, Lowery told her that it was "probably best for him to leave," and she acknowledged this was true. She said someone had told her Lowery had admitted at the hospital to doing something to the victim.

The same night, the victim's mother's parents drove approximately seven hours from their home in Illinois to help her. Two-and-a-half months later, the victim was released back into his mother's custody. She immediately moved back to Illinois and divorced Lowery six months later. After moving to Illinois, the victim underwent physical therapy for one to two months. At the time of trial, the victim was a normal six-and-a-half year old boy. The victim had not suffered any fractures to his bones after moving to Illinois.

Ron Boucher, a detective with the Oak Ridge Police Department, testified that he responded to a call from DCS workers the night the victim was taken to the hospital. He met the DCS workers, who informed him that a two-month-old boy had come in with injuries, and talked to the victim's mother in a conference room in the presence of the DCS workers. During this interview, a physician informed them that the victim had more fractured bones. Detective Boucher said that while the victim's mother initially acted normal, she became "very emotional and started crying" when he asked her if she had injured her son, and she denied causing his injuries. Following their discussion, the victim's mother gave him a written statement, in which she stated that on the way to the hospital, Lowery suggested that the victim's bruise could have been caused by the victim falling asleep on him or his holding the victim the wrong way. She also wrote that Lowery said he could have hurt the victim's arm by picking up the victim the wrong way.

Detective Boucher next interviewed Lowery at the hospital. Lowery acted normal and could provide no explanation for the victim's fractured arm and ribs. When a physician interrupted the interview to inform Detective Boucher that the victim also had sustained fractures to his legs, Lowery appeared shocked and could provide no explanation for these injuries.

Lowery subsequently provided two written statements to Detective Boucher. In the first statement, which summarized his activities over the last twenty-four hours, Lowery did not mention anything about the cause of the victim's broken bones. When Detective Boucher asked him whether a person who had broken a two-month-old infant's bones deserved a second chance, Lowery responded that it would depend on the severity of the injuries and whether "it was a one-time thing" or whether it occurred "over a long period of time." Detective Boucher then asked Lowery what he and the victim's mother talked about on their way to the hospital. Lowery first said that the ride was quiet and that they did not place blame on one another; then he leaned back in his chair and stated, "[N]othing was on her, it's all on me." Detective Boucher asked Lowery about the victim's broken arm, and Lowery said he once grabbed the victim by his arm and shoulders to get him out of the swing. When he asked about the broken ribs, Lowery said that although he did not know why, he started squeezing the victim, and when he heard a rib pop, he stopped. When Detective Boucher questioned Lowery about the victim's broken legs, Lowery said that when he was changing the victim's diaper, he grabbed the victim at mid-thigh and pulled him across the bed and stood him up. Lowery was unable to pinpoint a date or time when these acts occurred and could not tell Detective Boucher whether these acts occurred during a single incident or different incidents.

A short time later, Lowery provided a second written statement, witnessed by Detective Boucher but not the DCS workers, which included his prior admissions regarding the victim's injuries. To explain the victim's broken arm, Lowery wrote that he lifted the victim out of his swing by his left forearm and pulled the victim toward him. Lowery said that he slid both of his arms up to the victim's shoulders before lifting him to his chest, stating that he "guess[ed] the way [he] lifted him was too much pressure" on the victim's arm but that he had "no idea" that he exerted enough pressure to break the victim's left arm in two places. Lowery also admitted that when he picked up the victim to feed him, he "squeezed him with both [his] arms around each rib cage [sic] area,"

- 5 -

although he did not believe that he caused rib fractures at the time. He claimed the victim "never let out any cry in the days following" to let him or his mother know that something was wrong. Lowery wrote that when he was changing the victim's diaper, he "slid him towards [him] by [grabbing] both of his legs around mid-calf and started raising him slightly off the bed." He said he "got [the victim] at the wrong angle ... and had no idea" that the victim's legs were broken until Detective Boucher told him of that fact. He said that finding out about the victim's broken legs "was a complete shock" because the victim never "let out a whimper, a cry, or even a moan." Finally, regarding the bruise on the victim's back, Lowery wrote that he "was trying to wake [the victim] up and [he] raked across his rib cage [sic] with [his] right knuckles" as he was attempting to get him to finish his bottle. He said he "had no idea of what [he] had just . . . physically done to [his] 2 month old."

During trial, the parties stipulated that the matters of fact contained in a tape recording and transcript of a juvenile court proceeding on January 29, 2008, were true, and both the recording and transcript were admitted into evidence. During the January 29, 2008 hearing, Lowery admitted that he squeezed his son for several seconds while his wife was asleep sometime between midnight and 2:30 a.m. Lowery said that when he heard something pop on the victim's left side, the victim made a noise like "uh." He asked himself what he was doing because his hands were around the victim before he "even realized [he] even had him[.]" He admitted that he did not seek medical attention for the victim after hearing the "pop" sound and did not tell his wife about the incident. He also admitted grabbing the victim by his legs to stand him up one time and, when he was exhausted, grabbing the victim by his arm to get him out of the swing. He said he had "no idea" of the extent of the victim's injuries until they were at the hospital. Lowery asserted that he believed the victim got the bruise on his back from the way he laid him down. He asserted that his wife "would rather put a bullet in her head, than to scratch" either of her sons. He also stated that "as Jesus Christ is my witness, [his wife] is a perfect mom" and "would not harm [her sons]" in any way.

John Davis, a case manager for the child protective services unit for DCS, testified that he was called to the hospital on January 24, 2008, to respond to a child abuse case that was "coded severe." He gathered his paperwork and contacted Detective Boucher about the case. Upon arriving at the hospital, physicians told him that the victim had sustained eight to twelve broken bones. When Davis interviewed the victim's

mother, she was in "disbelief and shock" that the child was injured and "did not have a concrete answer as to how the injuries occurred."

Davis's interview with Lowery lasted substantially longer than his interview with the victim's mother. At first, Lowery tried to guess certain situations that could have caused the child's injuries. Davis said Lowery "was a tad bit uncomfortable" and eventually talked to Detective Boucher alone. After approximately thirty to thirty-five minutes, Detective Boucher asked Davis to come into the conference room and gave him a synopsis of what Lowery had just told him. Davis said Lowery "seemed relieved that the truth was coming out." While Lowery was defensive and tried to "explain away" the victim's injuries during his first conversation, Lowery was "much more relaxed" and answered all of Detective Boucher's and Davis's questions during the second discussion.

Dr. Jeffrey Abrams, a pediatrician and an expert in the field of pediatric emergency room medicine, testified that he was working in the emergency room on January 24, 2008, when the victim came in after his initial x-rays had been taken. He observed "multiple small circular, what appeared to be, bruises, light bruises on his upper back" that were consistent with a hand print. He explained that it was "very unusual to have bruises on a two-month-old baby" because they do not move around enough to be injured.

Dr. Abrams said the victim also sustained multiple rib fractures. In addition, the victim had a healing fracture on his upper left arm and had fractures in the two bones in his lower left arm. He could tell that the victim was in pain from these fractures because when he tried to move the victim's left arm, he "appeared uncomfortable." The victim also had healing fractures on his right and left shin bones. When Lowery was told that the victim needed a CAT scan, he got angry and demanded to know why it was necessary. The CAT scan showed that the victim had "possible previous brain injury." Because of the fractures and the victim's abnormal CAT scan, the victim was admitted to the hospital so that he could be put in a cast and given medication for pain. Dr. Abrams ultimately diagnosed the victim with "multiple fractures, non[-]accidental trauma, suspected abuse." He opined that the victim's fractures were the result of physical abuse.

Dr. Abrams did not observe any evidence of "nursemaid elbow," which is another name for a dislocated elbow that occurs when a child is yanked by his or her arm. He asserted that pulling a child out of a swing

would not cause the victim's fractures; instead, the arm would have to be hit against something or twisted to result in fractures like those in the victim's left arm. In addition, leg fractures like those sustained by the victim required substantial pressure or force and resulted from a person "twisting" or "grabbing" the leg or the victim's legs being "struck against something." He opined that it was "almost impossible" to fracture an infant's legs by grabbing the legs at mid-calf and sliding the infant across a bed or changing table. Based on the tests he performed and the x-rays he examined, he saw no evidence that the victim had brittle bone disease.

Dr. Clifford Meservy, an expert in the field of pediatric radiology, testified that he reviewed the victim's x-rays and observed fourteen healing rib fractures on the left side and seven healing rib fractures on the right side. One of the victim's ribs had three fractures, and there was evidence that some of the ribs had been re-fractured from repetitive trauma. He said that he assumes a child with multiple rib fractures has been abused unless someone can provide an explanation for the fractures. He noted that even when CPR is performed on an infant, ribs rarely fracture, which meant that the victim's chest "was compressed far more than you do doing CPR which is rapid chest compressions at a hundred per minute." He opined that the victim's rib fractures occurred at least two weeks prior to the date the x-rays were taken.

Dr. Meservy said the victim sustained a fracture to a particular part of the humerus bone in his left arm, which was almost always a sign of abuse, and the humerus was also fractured at the top and bottom of the bone. In addition, the victim's ulna had two fractures that were more recent than the rib fractures and probably occurred within the previous eight days. Finally, the victim's radius bone had a fracture. The victim also sustained fractures to the humerus, scapula, and radius bones in his right arm. Dr. Meservy noted that the fracture to the victim's scapula, the bone normally called the shoulder blade, was very unusual and that this was the first time he had observed a fractured scapula in a child despite his years of medical practice. He said the presence of a scapula fracture alone was indicative of child abuse, and the victim's scapula fracture appeared to be at least two weeks old.

Dr. Meservy noted that the victim had also sustained a healing fracture to the "mid shaft" of the left tibia. Because the victim's broken leg had not been promptly set, refractures had occurred that resulted in "excessive callus formation" on the bone. The victim also sustained a healing fracture to the "mid shaft" of the right tibia, and the x-ray indicated a re-

fracture in this area. The victim's right femur was also fractured. Dr. Meservy stated that the variety of the fractures and the differing ages of the fractures indicated abuse. He also said the victim, who was approximately two months old, "had evidence of repetitive trauma, not just one event over a period of time."

After reviewing the victim's CAT scan, Dr. Meservy observed several dark, abnormal areas called encephalomalacia in the frontal lobes that represented a softening of the victim's brain. He opined that the dark areas, which were indicative of trauma, formed from hemorrhages in those areas.

After listening to Lowery's written statement regarding how he believed the victim's injuries occurred, Dr. Meservy said that although Lowery could have possibly injured the victim's arms in the way he described, Lowery's version of how the victim's ribs and legs were fractured did not seem plausible and did not match the victim's x-rays. He noted that the tibia and the femur are the strongest bones in the body and that it would require a "direct blow to fracture those bones." After examining the victim's x-rays, Dr. Meservy did not see "anything radiographically to suggest . . . that this baby [was] suffering from any type of disease that [was] making [his] bones weak[.]" He also said that if the victim had suffered no further fractures since his hospitalization, this would imply that the victim did not have brittle bone disease, otherwise known as osteogenesis imperfecta.

Dr. Marymer Perales, an expert in the field of pediatrics and child abuse pediatrics, testified that when she examined the victim in the hospital, he had a splint on his left arm. She said the victim's left arm fractures were less than ten to fourteen days old because he did not have any callus formation on the bones. By the time of her examination, the victim had received several doses of pain medication, which was a combination of Tylenol and Hydrocodone or Tylenol and Codeine. She explained that nurses review a child's heart rate and blood pressure to determine if the child is in pain and opined that "if the nurses were giving the medication[,] the [victim] was exhibiting . . . signs of pain."

Dr. Perales reviewed the victim's x-rays and noted that the victim had thirty fractures, including healing and new fractures. She said it was often difficult for lay persons, and even physicians, to recognize that an infant's bones were fractured because swelling may be hard to observe in light of baby fat and because infants often cry even if they are healthy.

- 9 -

Dr. Perales stated that rib fractures in an infant are usually caused by direct blows or by squeezing the child and that the force necessary to fracture an infant's ribs would have to be "excessive and not in the natural course of caring for a child." She added that the popping noise described by Lowery could have been the sound of the initial fracture or the sound of the rib grinding on itself before it began to heal. Moreover, she said that while a baby could fracture an arm if the arm was wedged between a parent's body and the arm of a chair, as described by Lowery, the victim in this case had several fractures to his left arm, which could not have occurred as Lowery described. She acknowledged that the victim's left arm fractures could have been caused by "jerking" or "pulling" the victim's left arm to pick him up, as described by Lowery. She said that such forces were "not . . . normal care-type forces" and if someone witnessed that type of event, they "would be concerned that the child was injured." Regarding the victim's scapular fracture, she stated that this fracture required a lot of force and was typically seen in things like car wrecks or motorcycle or airplane accidents. She asserted that Lowery's explanations could not have caused the fractures to the victim's right arm. Regarding Lowery's explanation of grabbing the victim's legs, sliding the child across the bed, and standing the child up, Dr. Perales stated that these actions "could explain some of the injuries that are seen in the lower extremities" but that she was unsure how someone "would stand up a two-month-old by the legs." She said the victim's leg fractures were caused by a "twisting, yanking motion" with "excessive force" that would have caused this child to cry. After examining the victim and reviewing the victim's tests and x-rays, she opined that the victim did not suffer from any bone conditions or diseases that would have caused these fractures.

Dr. Perales noted that the victim's CAT scan showed encephalomalacia, which meant the victim "had some kind of previous insult to that part of the brain." She said this finding was disconcerting, especially in light of the victim's other injuries. Dr. Perales opined that the victim had been injured multiple times because he had new and old injuries and that these injuries resulted from "non[-]accidental inflicted trauma." She also opined that the victim suffered "extreme physical pain" each time one of his bones was fractured.

Lowery, the Defendant–Appellant, testified that he was forty-seven years old and had two children. Lowery said that he would put his older son to bed, and his wife would stay up taking care of the victim from 9:30 to 10:15 p.m. each night. When his wife went to sleep, she would put the victim in the "floor swing," and Lowery would stay up until it was time

for him to feed the victim around 1:30 or 2:00 a.m. After feeding the victim, Lowery would sit with the victim on the couch or put the victim in the "Pack and Play" in the room where his wife was sleeping before finally going to sleep in the room with his older son. Lowery remembered his wife telling him that the victim was not moving his left arm as well as his right arm. He held the victim, acknowledged that he was not moving his left arm as well, and gave the victim back to his wife because he did not know what was wrong.

The night before the victim's two-month checkup, Lowery awoke sick to his stomach around 2:00 a.m. He told his wife that she needed to feed the victim and vomited three or four times. The next morning, his wife took the victim to his two-month wellness checkup. She called him shortly thereafter, telling him that they needed to take the victim to the hospital and if they did not go, they would be reported to the Oak Ridge Police Department. Once they arrived at the hospital, his wife went into a room with the victim, and Lowery was not given any information regarding the victim's condition for two-and-a-half to three hours. He eventually found his wife, who told him that the victim had sustained rib fractures and a fracture to his left arm. Lowery acknowledged that he was "frustrated" at the time because no one explained what was happening. He claimed he did not object to the CAT scan but wanted to know why it was necessary.

When Lowery talked to Detective Boucher and the DCS employees, he was "in shock" about his son and "didn't know how to answer the question" of how the victim had received his injuries. After Lowery gave his first statement summarizing what he had done in the last twenty-four hours, Detective Boucher asked the DCS employees to leave the room, and when they were alone, Detective Boucher told him that if he did not begin cooperating in the investigation, he was going to ensure that he never saw his children again. Lowery said he was fearful that his children would end up in foster care. When he gave his second statement, Lowery was "trying to rack [his] brain" for an explanation as to how the victim had received his injuries. He said he tried to "write something that would . . . satisfy" Detective Boucher.

After reading his second statement, Lowery denied jerking the victim out of his swing, denied squeezing the victim to the point of breaking the victim's ribs, and denied doing anything other than sliding the victim across the bed. He also denied raking his knuckles across the victim's ribs and said he included that admission in his statement only because Detective Boucher "threatened" him. Lowery admitted that there was

- 11 -

one incident when he had fallen asleep, and the victim had slid between him and the armrest, and he picked the victim up quickly, and he was fine. Lowery denied throwing the victim against a wall or the floor. He asserted that he had never mishandled the victim in any way and was shocked that the victim "had one fracture, let alone that many."

As to his statement that "it's on me; it's not on [his wife]," Lowery said he made that statement in order to keep his children out of state custody after Detective Boucher "threatened" him. He said "he would have confessed to anything" because he loved his children, "couldn't stomach the idea of them being in [the] custody of strangers[,]" and wanted his wife to be able to see their children.

Lowery did not agree with his wife's testimony that the victim was inconsolable when he held him. He said there were several occasions when the victim was crying while his wife was holding him, and he would take the victim, walk him around, and the victim would stop crying. He denied telling his wife on the way to the hospital that the victim's injuries must have been caused by something he had done.

Lowery acknowledged that his wife had once criticized him for the way that he was holding the victim, although he denied swinging the victim back and forth. He said he had never observed his wife harming the victim or doing anything to make him believe she had hurt the victim. He did not believe that any other family members would have harmed the victim.

Susan Tipton, Lowery's older sister, testified that she would not try to protect her brother if she believed he had hurt the victim. She acknowledged having an argument with her brother's wife when she found out his wife was thinking of taking the children to Illinois for several weeks, but she denied threatening his wife with a baseball bat. Mary Ann Nicely, who was Lowery's younger sister, testified that Lowery was a "great father." She could not imagine Lowery hurting his son.

Samuel Oakes, an elder at Lowery's church in Knoxville, testified that he had known Lowery his entire life and trusted Lowery around his children, grandchildren, and great-grandchildren. He said that Lowery had worked in the children's ministry at church and had never received a complaint. He was shocked about this case because Lowery "couldn't even hurt a dog much less a kid."

Jeffrey Oakes, Samuel Oakes's son and a pastor of a church in Johnson City, testified that he also had known Lowery his entire life. He was shocked when he heard about this case "because [Lowery] always loved kids and loved to be around children" and because he had never known him "to be violent in any way, shape, form or fashion." He said that Lowery was one of the youth leaders at church and that he had never observed Lowery behaving inappropriately around the children.

Lora Dowling, Samuel Oakes's daughter, testified that she had known Lowery her whole life and that he was her "best friend." She said Lowery had lived with her current family for almost two years following his arrest. She was "absolutely shocked" when she heard of Lowery's charges because "[t]his was out of character for who he is." Dowling said that she had observed Lowery around her children and his children and had never seen him behave inappropriately. When Lowery and his family visited her family four or five weeks before the victim went to the hospital, Dowling noticed nothing wrong with the victim and observed no tension between Lowery and his wife.

Robert Ellis testified that he had known Lowery for twenty years through church. Ellis said Lowery was "very good with kids" and had served as a Sunday school teacher and camp counselor at their church. When he heard about the victim's injuries, he "didn't think [Lowery] could have done it because [he had] never seen him real angry or acting like that with any kids."

*State v. Lowery*, No. E201500924CCAR3CD, 2016 WL 1253642, at *1-8 (Tenn. Crim. App. Mar. 30, 2016)

*Post-Conviction Hearing*

Dr. Julie Mack is a diagnostic radiologist "with a certificate of added qualifications in pediatric radiology. She is licensed in Pennsylvania. Dr. Mack reviewed several sets of images of the victim in the present case including CT images from January 24 and 25, 2008, and an MRI scan on March 19, 2008. She testified:

The infant [victim] had two areas of low density, so CT is all based on density, low density in frontal lobes in the white matter underlying the cortex. And they were characterized as areas of encephalomalacia was the term used in court and I would agree with that term. It is an area of volume loss, an area of loss of brain tissue.

Concerning the MRI, Dr. Mack further testified:

- 13 -

That study also showed the area of brain loss, focal loss of white matter between the cortex so the cortex is the superficial part, the one that is right on top of the brain. And below that is called the white matter. And that is where the brain tissue loss was. And the brain tissue loss was associated with signal abnormalities. And it was testified that those represented blood. And in my affidavit I explained that blood products of that signal, so it was high on T-1 and low on T-2, and that combination, if it was blood, would have been less than two weeks old. It would have happened while the [victim] was in care.

When asked if there was blood shown in the MRI images, Dr. Mack replied:

It could have been but then it wouldn't have been traumatic bleeding unless we assume that he was traumatized later, but it also could have been calcification. Calcification will show up on [an] MRI and will have that signal. So it would have been evidence of a very remote incident, calcification can occur in the brain and look like blood.

Dr. Mack testified that the CT images from January 24, 2008, did not show evidence of "acute hemorrhage" in the victim's brain. When asked if there was a mistake, Dr. Mack further testified:

Well, yeah. The testimony wasn't that the CT had hemorrhage[]. The testimony had always been that the CT didn't show hemorrhage. The testimony was that the MRI showed blood. If it was blood, when you and I think of blood we think of the red stuff. If it was blood on the MRI, it would have been less than two weeks old, which means the [victim] would have been bleeding while in protective custody or in care. And that's possible. But you can't use that then to say that it was traumatic. I think the issue I have with the findings on the scan is you can't use brain tissue loss as evidence of trauma. The brain tissue loss in this case was remote at the time of the CT. There was no swelling. Nothing to suggest this happened in the last couple of weeks. And the [victim] was born with forceps. This process, these little subcortical cysts have been described after forceps deliveries.

Dr. Mack agreed that there was no evidence of edema on the CT or MRI scans to support recent brain trauma to the victim. She testified:

Edema is just swelling. If something is . . . swelling can occur after trauma or after stroke. It just is a non specific response of the brain to some type of insult. This brain loss was below the surface of the brain

- 14 -

so the implication was, in the trial testimony, as I understood it, is that the [victim's] brain was moving back and forth from being shaken, for instance and that the brain hit the skull. If that were true then the cortex, the surface of the brain, would have been injured. This was below the cortex so that doesn't make sense. I think it is much more likely that these are subcortical cysts, subcortical, the word is leukomalacia, and that is a description of it, what it looks like on pathology, and it can happen after birth trauma. It can also happen from stroke, from venus infractions. And there is a big category of we-are-not-sure-why it is there. [The victim's] delivery; they used forceps. And whatever was seen on CT was old and I think in all likelihood was a birth injury.

Dr. Mack noted that there was no injury to the victim's neck and that he was "completely asymptomatic" when he was scanned. She testified that the "signal alterations" on the victim's MRI scan were "very remote blood products," which meant they dated back many months ago.

Dr. Mack testified that the victim had between twenty and thirty fractures and "except for the elbow that he wasn't moving, was completely asymptomatic." She agreed that ribs can fracture with force. However, Dr. Mack testified that multiple fractured ribs from a high force trauma would create a "flail chest," which would be visible on a physical examination and would have significantly compromised the victim's breathing. She said that flail chest is a medical emergency. Dr. Mack further testified:

And those patients almost always have to be intubated for respiratory support. Again, that is when it happens with high force trauma, it's a medical emergency. This child had four sequential ribs fractured in two places. He had a piece of his rib cage that was not attached to the rest of it. If I assume that those rib fractures were produced by high force trauma, I must also expect the other things that occur with high force trauma. The other option is that these rib fractures didn't occur all at once. They were the equivalent of stress-type fractures, just overuse of a bone that wasn't ready to handle the forces. So fragility fractures. That is the other possibility when you see all these fractures, which ordinarily you only see in high force injuries, but you had this incongruent baby who has no symptoms. Never did anybody recognize any symptoms despite more than twenty-one fractures of the rib cage.

Dr. Mack testified that ribs can be fractured under low force but that the ribs would not be of normal strength. She further said: "Anytime you have multiple fractures that are asymptomatic, you need to think about bone fragility." Dr. Mack was not aware of any testing in the present case for bone fragility. She noted that there was a fracture to the victim's acromial bone. Dr. Mack testified:

The acromion is a bone that comes off the scapula and then it meets with your clavicle. And this baby there was a fracture of the acromion on the right it was healing. The acromion is relatively protected, it's behind muscles and behind the shoulder girdle. So the same with the rib fractures, acromial fractures can be seen in high force injuries. But when they are, there is almost always, if not always, surrounding damage to the tissue. Again, I have typically seen in high force trauma acromial fracture in an asymptomatic child. To break that bone, a normal bone, generally requires high force. It's a protected area. And if that area of the chest, if that area of the shoulder, receives a high force blow, for instance, you will see evidence of that, lots of bruising, other bones that are fractured. That bone can also fracture in bone fragility. So bones are weaker than normal. I don't know why that bone does fracture but I have seen it in other cases of bone fragility and I have seen it fracture in the hospital. So we have an X-ray of a normal acromion and during hospitalization a fracture that appears new. So similar images in a fracture has occurred somehow in medical manipulation, whether moving the arms above the head for X-rays, who knows. Nobody really understands why that particular bone may fracture under low force states.

Dr. Mack testified that it would have been important for the attorney to consult with a radiologist in this case in order to help understand the imaging findings because a lot of the fractures were old. She noted that a radiologist could have helped to determine if some of the victim's fractures dated back to the victim's birth.

On cross-examination, Dr. Mack testified that she could have come to the same conclusion about the victim's injuries had she examined the medical imaging in 2008. She noted that the medical literature and procedures had been known since before 2008. Dr. Mack admitted that the victim's injuries could have indicated abuse but she said that one would have to do a complete workup in order to eliminate bone fragility as a factor. She did not examine the victim or consult with any of the doctors who had examined the victim or testified at trial. Dr. Mack testified that bone fragility is something that can get better over time depending on what caused the condition.

Dr. Mack testified that the only symptom that the victim had at the time of the imaging was that he was not moving his left arm. She further testified:

That was one of the thirty fractures. So all of those old fractures, including ones of the lower leg, one of which looked like it had been displaced, meaning the two bones not right next to each other, the child

- 16 -

never displayed symptoms from all those other fractures. So he was symptomatic from the left arm, wasn't moving it. That was a symptom.

Dr. Mack acknowledged that there was a bruise seen on the victim's back, in the pattern of an open hand, at the pediatrician's office. The following day Dr. Perales noted that the victim's skin was normal. Dr. Mack testified that she was not sure about the bruise. She agreed that the victim had broken ribs but she could not explain why the victim was not in distress due to the fractures. Dr. Mack asserted that the victim would have been in distress only if the fractures were from high force trauma. She could not say for certain how much pain would be caused by stress fractures from bone fragility but that "stress fractures can occur with minor symptoms[.]" Dr. Mack agreed that acromial fractures are rare. Dr. Mack did not know how the victim's legs were fractured but that one of them could have occurred at birth. She said that the injury to the victim's arm was "acute, less than seven to ten days of age." Dr. Mack agreed that she did not consult with Dr. Jeffrey Abrams, the pediatrician in this case or the expert pediatric radiologist, Dr. Clifford Meservy. She also did not speak with Dr. Perales, the pediatric child abuse expert in this case.

Dr. Charles Hyman testified that he is licensed in the State of California and is a researcher in pediatric bone injury. When asked if he taught on the subject, Dr. Hyman testified: "I have spoken to some groups, however, due to the politics of this situation, even though I was a professor at Loma Linda and spent thirty-five years at Loma Linda, I'm not allowed, because of pressure from the child abuse community, to talk on my research." Dr. Hyman also testified that he had been "excised" from the "child abuse society" because they did not accept some of his medical opinions. He said that his research and opinions were in the "minority of the child abuse group."

Dr. Hyman testified that he reviewed the victim's medical records, Petitioner's two hand-written statements, and a questionnaire that Petitioner completed regarding medical history and potential risks for bone fragility. He further spoke with the victim's mother about "historical facts." Dr. Hyman reached a different diagnosis than that reached by the doctors who treated the victim at the time of the injuries. He said that there was "definitive evidence that [the victim's] bones were abnormal, and the differential diagnosis of this finding must include metabolic disease, stress fractures, and other causes of bone fragility." Dr. Hyman did not believe that all of the victim's injuries were the result of trauma. He thought that some of the injuries could have been caused by the "modeling and remodeling process of the bone" which takes place during the first six months of life outside the womb.

Dr. Hyman testified that if he had been the treating pediatrician in the victim's case, he would have first determined whether the lesions on the CT scan and MRI were to the white matter or grey matter of the brain. He explained that injury to the grey matter would indicate trauma, such as a head bump or skull fracture, and injury to the white

- 17 -

matter was known to occur during child brain development. Dr. Hyman asserted that "the literature has a lot of documentation of this starting way before the trial in 2008." He testified:

> [T]hen there is a bruise and so the history of the bruise, as I noted from my records, was that this bruise was on the left posterior back of [the victim]. It was not known to either parent or anyone else who saw the child until they went to the doctor's office. It was noted during the doctor's exam and the . . . so that means a nurse or a nurse assistant could have been involved in handling the baby, also, before weighing and measuring the baby. So that would be the historical timeline. We have had numerous, numerous cases of bruising in infants, I mean, the literature is well documented that infants, even two-month-old infants can have bruising. You can have vascular fragility associated with . . . so this bruise does not have to have been a forceful event. And the question is if this was, there was a question whether it was a hand print or a fist, I certainly have seen cases of handprints on infants that are not forceful holding babies to feed, grasping babies. And these children should have a workup for vascular fragility or minor bleeding disorder. And I don't think [the victim] had any type of evaluation. The other thing that the bruise was not photographed, which if it was going to be part of a forensic evaluation, that is mandatory. So that is, in my opinion, a failure of documentation. It is not transparent and it can't be looked at by other individuals to give opinions on it. Then there is the multiple fractures. And the child did have an acute fracture of the left, I believe the left, arm. This was acute. And this was the symptom that brought the baby to the attention [sic]. This is history given that baby [sic] wasn't using the arm, well, for in one part of the record it says two days; and in another part it says two weeks. From the look of the fracture, it does not fit two weeks but it's certainly compatible with two days because there were no signs of healing. The question is what is the mechanism. And it was stated erroneously, in my opinion, by some of the doctors who evaluated [the victim] in 2008, that this had to be a high force injury. And that is absolutely wrong. It could be a high force injury but there is no sign of high force injury. And all fractures are not completed with a single application of force. So this history of a child just having a hand that is dangling is a history that I have seen dozens of times in these cases. And I consult with a pediatric orthopedist on a lot of these cases. And I didn't specifically on this but they know that you can have the history as stated, so the history is a valid medical history. The child had also an acute rib fracture, one acute rib fracture, left posterior third. That was not noted I believe by the hospital physicians. And then the child had multiple peculiar healing rib fractures in different

- 18 -

stages of healing all over the rib cage. And, certainly, these could not be caused by one single event. So the question comes up of the history of the confession of a squeeze that I'm not sure of the date but I think it was some sort of contemporaneous squeeze that the father said he caused. Certainly, couldn't cause all the rib fractures with one event. Then you go down to the legs and the legs, the tibias, the shin bones, and two very peculiar healing fractures, both with what we call exuberant callus, an excessive amount of callus. And I see this in children who have signs of a collagen problem. And we try and get testing on all these children because we can see even ten years up the road collagen morphology and perhaps a genetic variant in a test called whole exome sequencing. So we know what some of the variants, the mutations, the genetic mutations that are associated with bone fragility. And there is fifty or sixty of them and we are putting them in a panel to look for these. So the other thing is that this is very old; and one of them looks like it could be dated to the birth process. Could be two months old. Certainly, none of those two fractures are acute and have nothing to do with a pulling of the legs that were stated in the report by the father within some days or a week or so whenever, I don't remember the exact date. But these were much older. There were a lot of irregularities in a part of the bone called the metaphysis. The metaphysic is the growing part of the bone. And during the growth spurt in the first six months of life there is a rapid laying down of the protein part of the bone called osteoid or matrix and then a slow mineralization component. And so there is a time where there is a temporary fragility that could occur and then we see these mineralized irregularities that are often mistaken for fractures. We know they are not fractures because, A; there is no history of fracture. There is no pain or limitation of motion, no redness, no swelling ever documented in these metaphyseal areas that were listed in the chart. And then you should have had follow-up X-rays to see if these fractures go through the radiographic stages of healing. The metaphysis is a very, very vascular area so there would be bleeding and you would expect radiographic signs of healing, such as endosteal sclerosis or subperiosteal new bone formation or callus formation on the sequence of these events. When you work up, you asked me about the workup, the mandate by medicine in general and also the American Academy of Pediatrics is the fact that child abuse with regard to fractures, there is no fracture that is specific to child abuse. This is stated in the child abuse literature, as well as the non child abuse literature, where there are competing thoughts in many of these areas. You don't have a definitive way of diagnosing child abuse from X-rays, it becomes a default diagnosis. So you have to exclude all reasonable forms of fracturing that could mimic this. And bone fragility is the large topic or large heading that could cause that. There was no

comprehensive examination to rule out bone fragility. In fact, this was one of the worse evaluations. It didn't even have basic tests that are done almost everywhere in 2008. And, certainly, even when I was doing it in the seventies. There was not a basic phosphorus or magnesium. There was no look for parathyroid hormone, there was no evaluation of vitamin D metabolites. There was no look at ionized calcium or calcium creatinine excretion or phosphorous creatinine excretion. And there were no tests that were done to look for mineralization or a bone structure. And there is non invasive tests that had been available for decades called quantitive ultrasound. So you would have to do this. You can't just default into that. So one of the points that the doctors at the hospital stated, Mr. Meservy and Perales stated that these had to be high force injuries. There is no way that they can tell whether these are high force injuries. You can't tell. They didn't know bone strength. You can't tell the force that it would take to fracture a bone without knowing bone strength. And you certainly can't tell bone strength by plain X-rays, that is total nonsense, it was a misrepresentation, in my opinion, to the Court.

Dr. Hyman disagreed that a child with fractures like that of the victim's would be crying in pain all of the time. He noted that the victim had an acute left posterior third rib fracture that no one knew about that was not detected by X-ray. The victim also had an acute ulna fracture. Dr. Hyman noted that the victim did not cry in pain unless the area was moved. He also disagreed that all fractures need an explanation and that if a parent or caretaker does not have an explanation for a child's fracture, then they are hiding something. Dr. Hyman further testified: "So this concept that babies are going to be crying in pain and families should know about it, that is not valid science." He said that if there are multiple fractures in "three consecutive ribs that are separated, you have what would be a flail chest and that would be, in adults or older children, an intensive care situation." However, this can happen in "those children with bone fragility."

Dr. Hyman agreed that his report in the present case was very lengthy because he was "going against established teachings of the child abuse community." He said: "So I put out these reports with hundreds of medical references to show why with child abuse some of the concepts that we are dealing with in this case are incorrect." Dr. Hyman testified that he also reviewed the images in this case with a pediatric orthopedist and the chief of pediatric radiology at Loma Linda Hospital, and he said that there was "a discrepancy of interpretation of findings."

Dr. Hyman testified that he counted more than twenty fractures to the victim's ribs. He said:

- 20 -

And if you go to the infant trauma literature, you would know that in children with normal bones if you have four or more rib fractures the kid is usually critically ill and in intensive care, you usually have physiological instability. And the only time that I have ever seen so many fractures is in these cases a metabolic bone disease in children that you wouldn't be able to tell.

Dr. Hyman also testified that the "more fractures you have, without any signs of high force injury, means that they can't be high force injury." He said that it was "virtually impossible for this to be a high force, traumatic injury in somebody with normal bone strength." Dr. Hyman noted that the victim's fractures were healing in an unusual way that was only seen with metabolic bone disease and/or stress. He noted that Dr. Meservy, who had treated the victim, said that the "fracture lines were going into the callus. And he interpreted this as refracturing." Dr. Hyman testified that the victim's bones were abnormal and the injuries did not fit the clinical pattern of high force injury.

Concerning the injury to the humerus on the victim's left arm, Dr. Hyman testified that they were mineralization changes not fractures. He said that the injury to the victim's left ulna and radius was a fracture that could have been caused by the "normal activities of daily handling of the child, getting the child in and out of a onsie or lifting children sometimes you can get a bending of this part of the bone." Dr. Hyman did not believe that the radius and ulna fractures were caused by a high force impact. He also did not believe that the injury to the victim's right radius was a fracture; he believed it was an "irregularity" that could have been "metabolic due to growth."

Dr. Hyman testified that the victim had a fracture to his right scapula, which he referred to as an "acromion fracture." Concerning this injury, Dr. Hyman testified:

And in Kleinman's Classic Textbook of Child Abuse Radiology there is a statement from the eighties that says this is a rare injury and, without-an-explanation, it is child abuse. And here is this without an explanation again. So I have a collection of eleven now that we are finishing a manuscript on. I think [the victim] was the eleventh, or maybe we've had one since. So eleven fractures of this acromion process. You go to the literature and you start looking at fractures of the acromion and all the fractures of the acromion, unless you have bone disease, are high force injuries. And it is a hard area to get to because the acromion is protected by the shoulder girdle. So even if you look at football players and stuff when they get torn rotator cuffs or fractured clavicles, very rarely do they have a fracture of the acromion. So the literature says that when you have blunt force thoracic trauma and you have normal bone strength, it is a rare occurrence and it is a high force injury. And it is always associated with some other fracture or evidence of high force

- 21 -

injury trauma in the area of the, in this case it would be the right shoulder girdle. Now there isn't. And it is characteristic of the other ten acromion fractures that we have in these infants. There is no evidence of high force injury and not one of them were symptomatic.

It was Dr. Hyman's opinion that the victim's right radius was not fractured but showed an irregularity of the metaphyseal corner, which he agreed with the radiologist was an irregularity. He said, "And, again, irregularities, differential diagnosis could be traumatic, accidental, as well as non accidental. But it could also be metabolic due to growth."

Dr. Hyman testified that the injuries to the victim's left and right tibias were old and "very atypical injuries." He said that injury to the left tibia "looked like a green-stick fracture, there was exuberant callus. Very, very unusual bone morphology that just does not look normal to me." Dr. Hyman noted that there was a "small segment" of the population that did not heal like everyone else.

On cross-examination, Dr. Hyman agreed that his opinions are not generally accepted by the child abuse society. He said: "I am in the minority of the child abuse group, however, that's why I produce a report with four hundred medical references." Dr. Hyman assumed, based on information from the medical records, that Petitioner or the victim's family did not know about the bruising on the victim's back. He agreed that those who abuse children are not always honest about what happened.

Dr. Hyman testified that Petitioner's statement that he pulled the victim by the leg would not cause the fracture to the victim's tibia. He thought that the injury occurred "in the last week or so" before the imaging. Dr. Hyman testified that there was "[a]bsolutely no evidence" in the record to indicate that the injuries to the victim's ribs were caused by high force trauma. He did not believe that the victim's injuries were non-accidental. He further testified: "These are injuries that are associated one sees with bone fragility disorders. Most of them are due to stress fracture [sic] that magnify." Dr. Hyman testified that the information on which he based his opinion was not new information and that it had been around since the seventies. He said that "bone fragility is not new but ways of diagnosing it is new." Dr. Hyman agreed that there was no new information since 2014 that would make his testimony any different than what it would be before 2014. Upon questioning by the trial judge, Dr. Hyman agreed that he did not question any of the doctors who testified in Petitioner's trial. His notes also did not reveal that he reviewed the transcript of Petitioner's trial testimony during which Petitioner testified about holding the victim by his legs and pulling him up and holding the victim up.

Trial counsel testified that he was hired by Petitioner's family to represent him at trial. He reviewed all "the points and medical practice of all the doctors who treated [the victim]." No one ever stated that the victim suffered from a metabolic bone disease.

However, trial counsel testified: "There was some discussion or information passed along to me from his family that that may have been an issue." Trial counsel agreed that the State's proof at trial showed that the victim's potassium, sodium, and calcium were normal. The doctors at trial all testified that the victim's blood tests were normal and that there was nothing to indicate that the victim had a metabolic bone disease.

Trial counsel testified that Petitioner's sister went online prior to Petitioner's trial and found a website on brittle bone disease. Trial counsel was then asked to contact the doctor from the website, Marvin Miller. Trial counsel testified:

> Yeah, I had spoken with him on the phone and mailed him records. He did not receive the mailed records so we emailed the records. And, ultimately, when I got to the point of confirming that he had received all the records he indicated that there was some dispute within his practice about him continuing to do testimony or consulting related to this aspect and said he didn't have time to deal with this particular case.

Trial counsel said that he then consulted with Dr. Pedigo, a pathologist, concerning Petitioner's case. He testified that Dr. Pedigo previously worked for the Knox County Medical Examiner's Office and that "he does do consultant work, sort of clearing house work, for legal cases where attorneys need to get some medical information. He reviews the materials and if there is something substantive he will refer you to the appropriate expert." Trial counsel was not certain if Dr. Pedigo lost his medical license but noted the he was "terminated from his employment under some rather unique circumstances." Trial counsel also noted that Dr. Pedigo's "medical capability was not the issue why he lost his job."

Trial counsel testified that he told Petitioner that he had spoken with Dr. Pedigo and that "he would not be available for trial but that he was going to be sort of a clearing house and provide us a starting point if, in fact, he came up with information that was beneficial to us." Trial counsel also noted that Dr. Pedigo was a medical doctor who was qualified to look at the materials in Petitioner's case and "if he found that there was further review that was necessary, then he was going to refer to it but specifically we went to Dr. Pedigo to see if he can make a determination if there is some type of temporary brittle bone syndrome."

Trial counsel testified that Dr. Pedigo reviewed the victim's medical records and did not find anything indicating that the victim had temporary brittle bone issues. He also indicated that all of the tests were normal. The victim's pediatrician, Dr. Machen, testified at trial that he examined the victim and found a bruise that he felt was new because there was no yellow discoloration. Trial counsel did not question Dr. Machen about the State's child abuse theory. Trial counsel testified that there was no further

- 23 -

testing done on the victim after he was placed with foster parents and then returned to his mother's care.

Trial counsel recalled that Dr. Abrams, the emergency room physician, testified that it was unusual to have bruises on a two-month-old baby. Dr. Abrams also said that "babies, or infants, that age roll, that someone else would have to cause the bruises[.]" Trial counsel agreed that he did not ask Dr. Abrams any questions about that testimony on cross-examination. It was trial counsel's recollection that Dr. Abrams testified that the fractures and healing ribs would require an external force. He asked Dr. Abrams some questions on cross-examination about that particular testimony, as to whether the injuries could have been caused by accidental means. Trial counsel testified that all of the doctors who testified at trial were concerned with the victim's large number of fractures.

Trial counsel agreed that Dr. Abrams testified that the injury to the victim's left arm must have been caused from twisting or being thrown against a wall. Dr. Abrams testified at trial that the injury could not have been caused from Petitioner pulling the victim up out of a swing. Trial counsel also agreed that Dr. Abrams testified that the victim's legs "would have had to been manipulated or twisted to cause those injuries[.]" Dr. Abrams testified that the injuries could not have been caused by Petitioner sliding the victim across the changing table. Trial counsel testified that Dr. Abrams also said that the victim's bones had "[n]ormal mineralization."

Trial counsel agreed that he did not present any proof at trial that the victim had rolled off of the changing table, fallen down the steps, or been pulled up out of a swing. He said that the State presented some proof of those instances from Petitioner's own statements in juvenile court and to Department of Children's Services (DCS) and Officer Boucher which indicated "squeezing, pulling him up out of the swing and, also, the changing, rolling, or pulling his legs on the changing table[.]" Trial counsel testified that the doctors at trial testified that those actions could not have caused the victim's injuries.

Trial counsel agreed that Dr. Meservy, a radiologist, testified at trial on direct examination concerning all of the victim's fractures. Trial counsel said that he did not ask any questions about that because there was nothing to dispute Dr. Meservy's testimony concerning the injuries. Trial counsel also agreed that he asked Dr. Meservy two questions at trial. Trial counsel testified: "I disputed what was causing these injuries. There wasn't a dispute what the injuries the child had."

Trial counsel testified that he asked Dr. Perales at trial concerning the contents of Petitioner's statement about how the victim's injuries occurred. Dr. Perales testified at trial that the swing, squeezing, and the changing table incidents would not have caused the fractures. She agreed with Dr. Meservy that great force, such as a car accident, would have been needed to cause the injury to the victim's scapula. Dr. Perales also testified that the injury to the victim's legs would have to have been from a twisting motion. Trial

counsel testified that he also asked Dr. Perales if an infant feels pain. Trial counsel said that Dr. Perales testified that there was no indication of metabolic bone disease. He did not ask Dr. Perales about the fractures because the "issue of whether they were fractures or not was not an issue in this case. It was the manner of how they got there."

Trial counsel testified that the victim's mother told Dr. Machen that Petitioner could not have caused the bruising to the victim because she had not left the victim alone with Petitioner. Trial counsel agreed that it was never a defense that the victim's mother caused the victim's injuries because Petitioner was "adamant that he did not want that issue raised." Trial counsel further testified: "I wanted to bring that up and tried to infer that to the jury. And I think my understanding is after the verdict there were some jurors that had made comments that why wasn't she on trial." Trial counsel testified that he did not consult any other doctors on Petitioner's case because Petitioner "indicated that he did not want to spend any more resources on that." Trial counsel further testified that Petitioner "made it clear that he was not going to spend any more funds in this arena of hiring experts." Trial counsel was aware that an exact time of injury could not be given to healing ribs but that the injury could be classified as acute or chronic.

On cross-examination, trial counsel testified that he has been licensed to practice law since 1994, and at the time of Petitioner's trial, ninety to ninety-five percent of his practice was criminal defense work. He said that the subject of brittle bone disease was discussed throughout Petitioner's case. Trial counsel testified that Dr. Pedigo's advice was "consistent with what those other doctors testified to is that this trauma caused to this child was by some type of extremely violent actions of somebody." Trial counsel testified that Dr. Pedigo was adamant and clear in their discussions. He noted that Dr. Pedigo "offered that if we disagreed with his opinion or wanted to seek further assistance, he would provide me names of somebody we could discuss with." Trial counsel reiterated that Petitioner advised him that "he was not going to spend any more money on an expert."

Trial counsel agreed that in his cross-examination of the doctors at trial, he attempted to point out that Petitioner's admissions would not constitute the victim's injuries. He testified:

> We even tried to argue that he was candid and honest with the police officer, he was candid and honest with juvenile court, and that if he's candid and honest now before this jury, would these type of actions have caused these injuries.

Trial counsel testified that he was aware of the extent and seriousness of the victim's injuries. He did not see any benefit to having the doctors detail each of the victim's injuries to the jury. Trial counsel noted that there were "at least one or two jurors in this particular case that broke down and were crying during the testimony of those doctors[.]"

Trial counsel agreed that his defense in Petitioner's case was not to emphasize the gravity of the victim's injuries in front of the jury. He said: "It was the manner of the cause of those injuries that was the focus."

Trial counsel testified that Petitioner wanted to testify on his own behalf at trial. He thought that Petitioner's testimony hurt his case. Concerning the trial strategy, trial counsel testified: "That the matters that [Petitioner] confessed to in both open juvenile court and in a questioning session with Officer Boucher with the Oak Ridge Police Department, what he admitted to were matters that could not have caused these particular injuries." Trial counsel further testified that they conceded the injuries and "that what my client described on two occasions, and then ultimately on three occasions, were not those matters that caused this child's injuries." He acknowledged that other people had access to the victim including the victim's mother and some other family members. Trial counsel again testified that he was instructed by Petitioner not to implicate the victim's mother.

*Analysis*

### A. Ineffective Assistance of Counsel

We will refer to the trial court that heard the proceedings in both the post-conviction and coram nobis matters as the post-conviction court. Petitioner contends that trial counsel in his case rendered deficient performance by failing to "adequately investigate the medical evidence." More specifically, Petitioner argues that trial counsel failed to "consult with a radiologist experienced in pediatric fractures and brain injuries."

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations of fact set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). On appeal, this court will affirm the post-conviction court's factual findings unless the evidence preponderates against those findings. *Id.* Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). Review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Plyant v. State*, 263 S.W.3d 854, 867-68 (Tenn. 2008).

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that: (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784-787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards.

*Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases).

Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Strickland*, 466 U.S. at 697; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Strickland*, 466 U.S. at 697. Additionally, the burden an appellant must meet upon alleging that counsel failed to discover, interview or present witnesses in support of his or her defense is the presentation of these witnesses "at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

In determining that trial counsel did not render deficient performance, the post-conviction court made the following findings:

> First of all, let me . . . the Court would make just a summary finding of both the expert witnesses who testified today. Both were qualified as experts. Both, in essence, have said that this brittle bone issue had been around for years. I do have to really find on Dr. Hyman, in addition to him obviously being a defense counsel's expert and making his living off that and he has received eight-six hundred and thirty dollars and twenty cents, he testified very clearly to questions asked by counsel for the petitioner. But on cross examination, and the record won't properly reflect the hesitations he had in answers, the record probably would reflect some of his stuttering as he was trying to answer. And, in fact, when the State's counsel actually cross examined on his own statement in a report he wrote, he said, you shouldn't quote me. That is what he is here for. The Court does not give little or any credibility to Dr. Hyman for those reasons. For many reasons, in addition to the three hundred to four hundred something reports that he is preparing in a report that has never been published, never been vetted, never been reviewed by his peers. Neither of the doctors in this case had actually even talked to the doctors who actually reviewed everything or reviewed all the medical records in this case. Dr. Mack was highly qualified. She was not paid and came here to testify on her own for some justice center,
>
> The Court would further find that [trial counsel] has been an attorney in this court before I became judge. And as an aside, when I became judge there were only three attorneys in this entire county who were capital case qualified. The public defender, Tom Marshall, [trial counsel], and myself. [Trial counsel] has been practicing law in excess of twenty years. He had been practicing for twenty years at the time of this trial.

- 27 -

The Court has always found him to be credible, as I would find him today. In fact, nothing he testified to has been rebutted. So the Court would find that, based upon [trial counsel's] testimony, unrebutted I might add, in addition to the finding that he has been an attorney for over twenty years, he was an attorney for at least twenty years at the time he tried this case. Ninety-five percent or more of his cases were criminal cases. And I so find. The Court would further find that he was a retained attorney. He was retained by the family of [Petitioner]. And, from the very beginning, the issue of brittle bone was an issue that they were wanting to submit because [Petitioner] had made two statements. One to Officer Boucher, I believe, I'm pretty sure it was Officer Boucher. The other one in juvenile court. And he testified here on the stand as to what he said he believed could have or should have caused these injuries. Even though there were brittle bone issues that were supposed to have been proven. A retained attorney can only do and hire those experts that the retained attorney gets authorization and funds from his client, or his client's representatives. He, obviously, got some funds to hire Dr. Pedigo to use as a consultant. As testified, Dr. Pedigo has been a forensic pathologist, if I recall correctly, for forty years in pathology. That he brought him in to do consulting work to make a determination as to what he should or should not do. Dr. Pedigo reviewed all the medical records, including the radiology for approximately three to four months. He indicated he could see no brittle bone issues and he found that all the tests were normal, just as testified to by each expert at trial. He goes back to his client and says we need to get further experts and his client refused. That is a finding of this Court unrebutted that [Petitioner] simply didn't want to spend any more money on medical experts. Didn't want to spend, quotation from [trial counsel], resources on the issues of brittle bone on experts. Had he been given the authority, I don't know if this case would have been different or not but [Petitioner] drove this car, drove this case and made the decisions as it pertained to experts.

The brittle bone issue was not a new issue. It wasn't new. That was something from the beginning, as testified to by [trial counsel]. All the doctors were concerned about the number of fractures. As I said, [Petitioner] got on the stand himself and testified as to what he believed had caused these injuries. He gave extensive testimony about squeezing, pulling, and so forth. Any issue not raised is as a result of [Petitioner] not wanting to raise it. He testified at the Momon Hearing, he understood that he didn't have to testify. That he wanted to get up and testify. I find that [trial counsel] made it clear to [Petitioner] that Dr. Pedigo was to see if there was any temporary brittle bone syndrome or

- 28 -

anything involving brittle bone. And that if they needed more testimony, he would come back and advise him of such. Dr. Pedigo, as I said, had been forty years or more in pathology. The brittle bone issues were discussed throughout the case. They actually agreed to hire or to consult with a doctor that apparently [Petitioner's] sister found. [Trial counsel] consulted with him and the consultant decided that he wasn't going to come and testify on that. And it is at that point that [Petitioner] said he is through providing resources and he was not going to provide another expert. The theory of the defense by [trial counsel]; the Court finds reasonable and finds justifiable. His client wouldn't spend any more money on experts. [Trial counsel's] method of arguing was that the client had been honest and candid and this was the only way the injuries could have been caused and wasn't anything else. The Court would further find there was no benefit in cross-examining any of these doctors on the injuries themselves because they acknowledged the injuries were there. He didn't want to emphasize the injuries, as he said, and as the Court observed and recalls clearly to this day, it was very emotional for these jurors. The Court would find, as testified and unrebutted, that [trial counsel] didn't want to magnify the gravity of these injuries.

I further find that he also suggested, as an alternative defense, that someone else could have done this, perhaps, even his wife. And [Petitioner] absolutely would not implicate and instructed him not to implicate his wife. These were decisions made by the defendant in this case. The defendant testified. He testified as to what he claimed may have caused the injuries. He's the one who made the decisions on the medical expert. [Trial counsel] was limited by his client's actions. He works for his clients.

The record supports the post-conviction court's findings. Our supreme court has recognized that in most cases, "the decision to select an expert, or which expert to select, constitutes one of the 'strategic' defense decisions that *Strickland v. Washington* shields from scrutiny." *Kendrick v. State*, 454 S.W.3d 450, 475 (Tenn. 2015). "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. ——, 134 S.Ct. 1081, 1089, 188 L.Ed.2d 1 (2014) (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052); *see Kendrick*, 454 S.W.3d at 474; *see also Braswell v. State*, No. W201600912CCAR3PC, 2018 WL 1719443, at *50 (Tenn. Crim. App. Apr. 9, 2018).

Trial counsel testified that he reviewed all of "the points and medical practice of all the doctors who treated [the victim]." No one mentioned that the victim suffered from a metabolic bone disease, and there was nothing to indicate that the victim had a metabolic

bone disease. Trial counsel noted that all of the victim's blood tests were normal, and the victim's potassium, sodium, and calcium levels were normal. Trial counsel admitted that there was "some discussion or information" passed along by Petitioner's family concerning the issue of metabolic bone disease. Trial counsel also acknowledged that Petitioner's sister found a website about brittle bone disease, and trial counsel was asked to contact the doctor from the website, Dr. Marvin Miller. Trial counsel then spoke with Dr. Miller and forwarded the victim's medical records to him. Dr. Miller later indicated that "there was some dispute within his practice about him continuing to do testimony or consulting related to this aspect and said he didn't have time to deal with this particular case."

Trial counsel testified that he then consulted with Dr. Pedigo, a radiologist who previously worked with the Knox County Medical Examiner's Office. Trial counsel explained that Dr. Pedigo did consulting work, "sort of clearing house work, for legal cases where attorneys need to get some medical information. He reviews the materials and if there is something substantive he will refer you to the appropriate expert." Trial counsel said that he told Petitioner that he had spoken to Dr. Pedigo and that "he would not be available for trial but that he was going to be sort of a clearing house and provide us a starting point if, in fact, he came up with information that was beneficial to use." Although Dr. Pedigo was not a radiologist, trial counsel noted that Dr. Pedigo was a medical doctor who was qualified to look at the materials in Petitioner's case, and "if he found that there was further review necessary, then he was going to refer to it but specifically we went to Dr. Pedigo to see if he can make a determination if there is some type of temporary brittle bone syndrome." Trial counsel testified that Dr. Pedigo reviewed the victim's medical records and did not find anything to indicate that the victim had temporary brittle bone issues, and he noted that all of the victim's tests were normal.

Trial counsel testified that he did not consult with any other doctors on Petitioner's case because Petitioner "indicated that he did not want to spend any more resources on that." Trial counsel further testified that Petitioner "made it clear that he was not going to spend any more funds in this arena of hiring experts." Trial counsel also testified that he was not aware of any experts who would consult on a case for free. Although there was no proof at the post-conviction hearing that trial counsel sought funds from the court for an expert witness, there is nothing in the record to indicate that Petitioner was indigent at the time of trial, and we note that only indigent defendants are entitled to state funds for expert services. *Steven Paul Deskins v. State*, No. M2004-02638-CCA_R3-PC, 2005 WL 2546926, at *9-10 (Tenn. Crim. App. Oct. 12, 2005); *Angelee Prater v. State*, No. E2007-02184-CA-R3-PC, 2009 WL 102994, at *12 (Tenn. Crim. App. Jan. 12, 2009).

Trial counsel agreed that the issue of brittle bone disease was discussed throughout Petitioner's case. He further noted that Dr. Pedigo's advice was "consistent with what those other doctors testified to "is that this trauma caused to this child was by some type

of extremely violent actions of somebody." Trial counsel further testified that Dr. Pedigo was adamant and clear in their discussions. Dr. Mack and Dr. Hyman both testified at the post-conviction-hearing that the victim's injuries were suggestive of bone fragility. Furthermore, Dr. Mack testified that the injury to the victim's brain was most like an old birth injury from forceps being used during the victim's delivery. However, Dr. Mack admitted that the victim's injuries could have indicated abuse but that she said that one would have to do a complete workup in order to eliminate bone fragility as a factor. She did not examine the victim or consult with any of the doctors who had examined the victim or testified at trial. Also, Dr. Hyman did not testify that all of the victim's injuries were due to bone fragility.

Trial counsel testified that it was never a defense in Petitioner's case that the victim's mother caused the victim's injuries because Petitioner was adamant that he did not want that issue raised even though trial counsel "wanted to bring that up and tried to infer that to the jury." Trial counsel noted that after the verdict, some of the jurors made comments about why the victim's mother was not on trial. Trial counsel testified that the State presented proof from Defendant's statements which indicated "squeezing, pulling [the victim] up out of the swing and, also, the changing, rolling, or pulling [the victim's] legs on the changing table[.]" Trial counsel testified that on cross-examination of the doctors at trial, he attempted to point out that Petitioner's admissions of those actions would not have caused the victim's injuries. Trial counsel testified:

> We even tried to argue that he was candid and honest with the police officer, he was candid and honest with juvenile court, and that if he's candid and honest how before this jury, would these type of actions have caused these injuries.

Trial counsel further testified due to the extent and seriousness of the victim's injuries, he did not see any benefit to have the doctors detail each of the victim's injuries to the jury. He noted that at least one or two of the jurors "broke down and were crying during the testimony of those doctors[.]" Trial counsel said that his strategy in Petitioner's case was not to emphasize the gravity of the victim's injuries in front of the jury. He said: "It was the manner of the cause of those injuries that was the focus." Trial counsel noted that Petitioner wanted to testify on his own behalf at trial, and he thought that the testimony hurt Petitioner's case. Concerning trial strategy, trial counsel testified: "That the matters that [Petitioner] confessed to in both open juvenile court and in a questioning session with Officer Boucher with the Oak Ridge Police Department, what he admitted to were matters that could not have caused these particular injuries." Trial counsel further said that they conceded the injuries and "that what my client described on two occasions, and then ultimately on three occasions, were not those matters that caused this child's injuries." Because a trial counsel's strategy was unsuccessful does not render their assistance ineffective. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Petitioner is not entitled to relief on this issue.

*B.  Denial of Petition for Writ of Error Coram Nobis*

Petitioner argues that the post-conviction court erred by denying his petition for writ of error coram nobis because the expert testimony at the post-conviction/error coram nobis hearing was newly discovered evidence.  We disagree.

A writ of error coram nobis is a very limited remedy which allows a petitioner the opportunity to present newly discovered evidence "which may have resulted in a different verdict if heard by the jury at trial."  *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001); *see also State v. Mixon*, 983 S.W.2d 661 (Tenn. 1999).  The remedy is limited "to matters that were not and could not be litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas proceeding."  T.C.A. § 40-26-105.  Examples of newly discovered evidence include a victim's recanted testimony or physical evidence which casts doubts on the guilt of the Petitioner.  *Workman*, 41 S.W.3d at 101; *State v. Ratliff*, 71 S.W.3d 291 (Tenn. Crim. App. 2001); *State v. Hart,* 911 S.W.2d 371 (Tenn. Crim. App. 1995).  The supreme court has stated the following concerning the standard to be applied when a trial court reviews a petition for writ of error coram nobis:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007).  Whether to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court.  *Id.* at 527-28.

A petition for writ of error coram nobis must be dismissed as untimely filed unless filed within one (1) year of the date on which the petitioner's judgment of conviction became final in the trial court.  *Mixon*, 983 S.W.2d at 670.  The only exception to this is when due process requires a tolling of the statute of limitations.  *Workman*, 41 S.W.3d at 103.  It appears that Petitioner's petition for writ of error coram nobis was timely filed in this case. In its findings on the petition, the post-conviction court noted that Petitioner's motion for new trial was overruled on May 1, 2015, and the petition for writ of error coram nobis was filed on April 20, 2016.

Petitioner makes the following argument concerning the petition for writ of error coram nobis:

> As discussed earlier in this brief, Dr. Mack presented credible evidence that the child's injuries were more likely due to fragile bone condition rather than traumatic abuse. She explained that the brain imaging revealed an old birth injury, not bleeding from a recent traumatic injury. The fact that appellant may have chosen not to pursue experts due to a lack of funds[,] this should not be deemed fault on his part. Neither appellant nor his counsel was aware of Dr. Mack or Dr. Hyman at the time of trial, or of the explanations they provide in regard to the medical evidence. While appellant was concerned about expenditure of funds on experts, appellant's limited economic circumstances should not prevent an injustice to occur in this case because he could not afford to retain a qualified expert consultant or witness for use in his defense.

Concerning this issue, the post-conviction court found that there was no newly discovered evidence. The post-conviction court further said:

> Brittle bone was at issue to begin with. So looking at the two petitions that were filed in this case; one, as I said, is the Writ of Error Coram Nobis. One of the things I must find is that he is without fault in failing to present evidence at the proper time. The defendant must be without fault. I can't find that. I further find it is not new or subsequently discovered evidence. As the last doctor who testified, the gentleman doctor who testified, it's the same, there is no new evidence since 2014 when this trial was. There was nothing else he could have added, if I were to believe him. For that part I do. So the Writ of Error Coram Nobis does not stand.

Petitioner's claims do not raise newly discovered evidence. As pointed out by the State, both Dr. Mack and Dr. Hyman based their opinions on the victim's medical records that were introduced at trial. Dr. Mack testified that she could have come to the same conclusion about the victim's injuries had she examined the medical imaging at the time of the offenses in 2008. She also noted that the medical literature and procedures had been known since before 2008. Dr. Hyman testified that "the literature has a lot of documentation of this starting way before the trial in 2008."

Additionally, Petitioner knew before his trial that bone fragility was a possible defense. In fact, trial counsel sent the victim's medical records to another expert, who was located by Petitioner's sister, to see if it was a defense that could be presented at trial. However, the expert, Dr. Miller, indicated that "there was some dispute within his practice about him continuing to do testimony or consulting related to this aspect and said he didn't have time to deal with this particular case." Trial counsel then consulted with

- 33 -

Dr. Pedigo, a pathologist, concerning Petitioner's case. He testified that Dr. Pedigo previously worked for the Knox County Medical Examiner's Office and that "he does do consultant work, sort of clearing house work, for legal cases where attorneys need to get some medical information. He reviews the materials and if there is something substantive he will refer you to the appropriate expert."

Trial counsel testified that he told Petitioner that he had spoken with Dr. Pedigo and that "he would not be available for trial but that he was going to be sort of a clearing house and provide us a starting point if, in fact, he came up with information that was beneficial to us." Trial counsel also noted that Dr. Pedigo was a medical doctor who was qualified to look at the materials in Petitioner's case and "if he found that there was further review that was necessary, then he was going to refer to it but specifically we went to Dr. Pedigo to see if he can make a determination if there is some type of temporary brittle bone syndrome."

This court has held that new expert opinions "on already-presented evidence" is not sufficient for error coram nobis relief. *Claude Francis Garrett* v. State, No. M2017-01076-CCA-R3-CD, 2018 WL 1976358, at *10 (Tenn. Crim. App. April 26, 2018). Additionally, this court has said: "The coram nobis statute is limited to provide relief from what may have been an injustice, not to reward a petitioner who had been successful in his search to find new experts who disagree with the previous experts involved in the matter." *Stephen Lynn Hugueley v. Sate*, No. W2016-01428-CCA-R3-ECN, 2017 WL 2805204, at *14 (Tenn. Crim. App. June 28, 2017). As pointed out by the State, the evidence that Dr. Mack and Dr. Hyman both used to reach their conclusions concerning the victim's injuries was available at the time of trial. Therefore, their testimony did not constitute newly discovered evidence simply because they disagreed with the expert witnesses who testified at trial. *Claude Francis Garrett*, 2018 WL 1976358, at *10; *Stephen Lynn Hugueley*, 2017 WL 2805204, at *14. Additionally, the evidence serves no other purpose than to contradict or impeach the evidence adduced during the course of the trial and cannot be characterized as newly discovered evidence. *See State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). Defendant is not entitled to relief on this issue.

CONCLUSION

After due consideration of the record, the briefs, and the arguments of the parties, we affirm the judgments of the post-conviction court denying both post-conviction relief and error coram nobis relief.

_____
THOMAS T. WOODALL, JUDGE